IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CYNTHIA J. E.,[1]

     Plaintiff,

     v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

     Defendant.

Case No. 3:25-cv-01759-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

Plaintiff Cynthia E. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Title XVI Social Security Income under the Social Security Act. For the reasons set forth below, the Commissioner's decision is affirmed, and this case is dismissed.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

**PROCEDURAL BACKGROUND**[2]

Born in October 1986, plaintiff alleges disability beginning September 21, 2019,[3] due to "chronic fatigue syndrome, migraines, endometriosis, polycystic ovarian syndrome, hyperacusis, asthma, delayed sleep phase disorder, myofascial pain syndrome, [and] adjustment disorder with mixed anxiety and depressed mood." Tr. 305, 334. Her application was denied initially and upon reconsideration. On September 26, 2024, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert. Tr. 37-56. On November 27, 2024, the ALJ issued a decision finding plaintiff not disabled. Tr. 15-31. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-6.

**THE ALJ'S FINDINGS**

At step one of the five step sequential evaluation process, the ALJ found plaintiff had "not engaged in substantial gainful activity since November 9, 2020, the application date." Tr. 18. At step two, the ALJ determined the following impairments were medically determinable and severe: "obesity, migraines, chronic fatigue syndrome (CFS), myofascial pain syndrome, [and] endometriosis." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 21.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that plaintiff had the residual function capacity ("RFC") to perform light work as defined in 20 C.F.R. §

---

[2] The record before the Court is more than 2100 pages, but with some incidences of duplication. Where evidence occurs in the record more than once, the Court generally cites to the transcript pages on which that information first appears.

[3] Plaintiff previously applied for, and was denied, disability benefits, such that her alleged onset date coincides with the date of the last decision. Tr. 15, 60, 113, 330.

Page 2 – OPINION AND ORDER

416.976(b) except she: "can occasionally climb ramps and stairs, never climb ladders, ropes, scaffolds, can occasionally balance, stoop, kneel, crouch, crawl; avoid concentrated exposure to work hazards such as dangerous moving machinery and unprotected heights, extremes of temperatures, and fumes, odors, dusts, gasses; can perform work at moderate noise levels (noise level 3)." Tr. 21-22.

At step four, the ALJ determined plaintiff had no past relevant work. Tr. 29. At step five, the ALJ concluded, based on the vocational expert's testimony, that there were a significant number of jobs in the national economy plaintiff could perform despite her impairments, such as marker, sub assembler, and routing clerk. Tr. 30.

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) failing to find her mental health impairments severe at step two, and (2) improperly rejecting the medical opinion of Richard Dillman, LMHC.

## I.    Step Two Finding

At step two, the ALJ determines whether the claimant has an impairment that is both medically determinable and severe. An impairment is severe if it "significantly limit[s]" the claimant's ability to do basic work activities, which are defined as "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.920(c); SSR 85-28, *available at* 1985 WL 56856. The Ninth Circuit describes step two as "merely a threshold determination meant to screen out weak claims. It is not meant to identify the impairments that should be taken into account when determining the RFC." *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017) (internal citation omitted); *see also Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citation omitted) (step two is a "de minimus screening device to dispose of groundless claims").

Page 3 – OPINION AND ORDER

Plaintiff points to evidence of "depression, anxiety, and mild cognitive impairment due to chronic fatigue syndrome" – largely as documented in Mr. Dillman's myriad opinions – as the basis of her step two challenge. Pl.'s Opening Br. 4-6 (doc. 9). But the mere diagnosis of an impairment "is not sufficient to sustain a finding of disability." *Young v. Sullivan*, 911 F.2d 180, 183-84 (9th Cir. 1990); *see also Febach v. Colvin*, 580 Fed.Appx. 530, 531 (9th Cir. 2014) (diagnosis of depression was "alone insufficient for finding a 'severe' impairment" where the record otherwise suggested it was not severe). And, as discussed in Section II, the record before the Court does not evince any significant impairment of function due to plaintiff's mental impairments.

In any event, the ALJ completed the psychiatric review technique and found at least one severe impairment at step two and then proceeded to consider evidence surrounding all of plaintiff's medically determinable impairments – including her purported depression, anxiety, and mild cognitive impairment – in formulating the RFC. Tr. 19-29. Therefore, any step two error was harmless. *Buck*, 869 F.3d at 1049; *see also Havens v. Kijakazi*, 2022 WL 2115109, *1 (9th Cir. June 13, 2022) ("even if the [step two] determination was in error, it was harmless because the ALJ considered these conditions among [the] claimed impairments in the [RFC] determination").

## II.    Medical Opinion Evidence

Where, as here, the plaintiff's application is filed on or after March 27, 2017, the ALJ is no longer tasked with "weighing" medical opinions, but rather must determine which are most "persuasive." 20 C.F.R. § 416.920c(a)-(b). "To that end, there is no longer any inherent extra weight given to the opinions of treating physicians . . . the ALJ considers the 'supportability' and 'consistency' of the opinions, followed by additional sub-factors, in determining how persuasive the opinions are." *Kevin R. H. v. Saul*, 2021 WL 4330860, *4 (D. Or. Sept. 23, 2021). The ALJ

Page 4 – OPINION AND ORDER

must "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." *Id.* At a minimum, "this appears to necessitate that an ALJ specifically account for the legitimate factors of supportability and consistency in addressing the persuasiveness of a medical opinion." *Id.*

In March 2016, plaintiff began seeing Mr. Dillman for monthly counseling sessions. Tr. 154, 847. In August 2019 – i.e., one and a half months before the alleged onset date – Mr. Dillman completed a "Mental Impairment Questionnaire (RFC & Listings)" in which he listed plaintiff's diagnoses as: "G31.84, F33.0, F45.42, F43.23, [and] major health pain issues." Tr. 433. He checked boxes endorsing the following associated symptoms: poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, loss of intellectual ability of 15 IQ points or more, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, decreased energy, difficulty thinking or concentrating, and pathological dependence or passivity. Tr. 433-34. In the associated narrative portion, Mr. Dillman wrote: "Had to leave school abroad, lives w/parents, can't work, zero plan for the future. Pain and neurological issues have derailed education and career plans." Tr. 434. In response to an inquiry surrounding what "clinical findings including results of mental status examinations [demonstrate the severity of plaintiff's] mental impairments and symptoms," Mr. Dillman similarly stated: "Pain and neurological issues have mentally impaired her." *Id.* He then checked boxes reflecting a number of marked and extreme limitations. Tr. 437-38.

Nearly two years later, Mr. Dillman completed two additional forms in support of plaintiff's claim. Specifically, in June 2021, he prepared a "Medical Source Statement (About What the Claimant Can Still do Despite Mental Impairment(s)," where he checked boxes indicating the following symptoms associated with plaintiff's diagnoses: poor memory, appetite

Page 5 – OPINION AND ORDER

disturbance with weight gain, personality change, mood disturbance, emotional lability, loss of intellectual ability of 15 IQ points or more, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, decreased energy, difficulty thinking or concentrating, social withdrawal, hostility or irritability, pathological dependence, and blunt, flat, or inappropriate affect. *Id.* He likewise endorsed a number of moderate to marked (and some extreme) limitations related to plaintiff's ability to function in the workplace. Tr. 848-49. Finally, Mr. Dillman opined that plaintiff would miss 29 days per month of work on average due to "her conditions and treatment" and would be off task 85% of an 8-hour workday. Tr. 851.

In July 2021, Mr. Dillman prepared a "Mental Disorder Questionnaire Form" that largely tracked his two prior opinions. In particular, he described plaintiff's "present illness" as follows: "Fatigue w/any exertion, post-exertion fatigue/malaise = worse the next day – needs to stay in bed for days, 7 yrs. of [reduced] functionality." Tr. 935. In the "past history of mental disorder" section, he wrote: "Mental health issues = MDD [major depressive disorder], recurrent, mild F33.0." Tr. 935, 939. He additionally listed a number of physical impairments that impacted plaintiff's functioning and increased her scores for exhaustion, irritability, isolation, and found a decreased overall ability to function. Tr. 935-39. He concluded by stating: "This woman cannot work, is disabled, and qualifies for SSD." Tr. 939.

After individually summarizing Mr. Dillman's August 2019, June 2021, and July 2021 reports, the ALJ determined they were "not persuasive":

> The counselling session progress notes from Mr. Dillman do not support his opinion. The treatment notes show no objective findings that would support marked-extreme limitations in mental functioning. He did not observe signs of difficulty with concentration, memory, or behavior. Moreover, his opinions are inconsistent with the routine course of mental health treatment, the observations of

Page 6 – OPINION AND ORDER

normal concentration and intact memory, the observations of normal mood and affect, and the reports of mild symptoms on PHQ-9s.[4]

Tr. 27 (internal citations omitted).

Initially, the Court notes that Mr. Dillman's August 2019 opinion predates the alleged onset date and was, in fact, considered in conjunction with plaintiff's prior application. Tr. 154-55. It thus cannot provide a basis for reversal given the underlying procedure history. *See, e.g.*, *Joe C. v. Comm'r of Soc. Sec. Admin.*, 2026 WL 1847028, *3-4 (D. Or. June 26, 2026)*; *see also Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) ("evidence that predates the alleged onset date of disability is of limited relevance").

Perhaps more importantly, plaintiff's counsel expressly disavowed the existence of any mental limitations at the 2024 hearing:

ALJ: [Y]our client [had a prior] Title XVI claim [and] now she's 37. Does that all sound accurate?

Plaintiff's counsel:[5] I stipulate to all that, Sir.

ALJ: All right. And so do you want to make any opening remarks?

Plaintiff's counsel: It's a Step 5 case, Your Honor. The lady has a number of medically determinable impairments. She has a fairly remote work history because

---

[4] To the extent plaintiff takes issue with "the ALJ group[ing] all three of Dillman's opinions together" and describing her mental health treatment as routine, her arguments are unpersuasive. Pl.'s Opening Br. 9-11 (doc. 9). The ALJ's opinion explicitly explains that plaintiff's care was routine because she had counseling sessions once per month and did not seek "additional treatment from mental health specialists during the period at issue" or "see a psychiatrist to manage medications." Tr. 20. Moreover, providers did not recommend that "she seek a higher level of care due to uncontrolled symptoms," including "inpatient psychiatric treatment," "emergency treatment," or "crisis interventions." Id. And, when a source like Mr. Dillman "provides multiple medical opinion(s)," the regulations require ALJs to "articulate how [those opinions were considered] together in a single analysis . . . We are not required to articulate how we considered each medical opinion." 20 C.F.R. § 416.920c(b)(1).

[5] As the Commissioner accurately denotes, "[a]t the hearing, Plaintiff was represented by Ho Peter Evans and John Cahill of Evans and Evans PC [and she] continues to be represented by H. Peter Evans" on appeal. Def.'s Resp. Br. 2 n.2 (doc. 11).

> a lot of these problems are fairly lifelong . . . I know some of it is mysterious and you know, CFS is an unattractive diagnosis for trying to prove the case [but even] if that didn't meet the criteria for an MDI, she's got these awful headaches . . . Recently, there -- thankfully, her mental health seems to be hanging in there, sir. But there are a number of other problems. But the one that's easiest to prove as far as disruption of her life is headaches . . .
>
> ALJ: And you're not alleging any severe mental impairments. Is that right?
>
> ATTY: That's right, sir. I asked her about that. There's no current treatment. She seems to be stable now.

Tr. 42-43, 51-52; *see also* Tr. 44-51, 55-56 (plaintiff testifying at the 2024 hearing to limitations associated with CFS, shoulder/neck pain, and migraines/headaches but neglecting to endorse any mental health problems).

Accordingly, the record strongly suggests that plaintiff's counsel withdrew or waived any issues surrounding plaintiff's mental health at the hearing for the purposes of this appeal. *Cf. Meanel v. Apfel,* 172 F.3d 1111, 1115 (9th Cir. 1999) ("at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal"); *see also Lui v. DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025) ("[w]aiver is the intentional relinquishment or abandonment of a known right") (citation and internal quotations omitted).

Regardless, the Court finds the ALJ properly considered the supportability and consistency of Mr. Dillman's opinions. An ALJ may find a medical opinion unpersuasive where it is inconsistent with the provider's own chart notes. *Stiffler v. O'Malley*, 102 F.4th 1102, 1107 (9th Cir. 2024). Similarly, inconsistency with the medical record is a valid reason to find a medical opinion unpersuasive. *See, e.g., Hahn v. Berryhill*, 722 Fed.Appx. 602, 605 (9th Cir. 2017); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

As plaintiff acknowledges, "there are few objective findings within Dillman's handwritten progress notes." Pl.'s Opening Br. 10 (doc. 9). And his records (as well as those of other providers and his actual opinions) overwhelmingly indicate that plaintiff's physical impairments were the main cause of any limitations associated with concentration, persistence, or fatigue, and were otherwise her main barrier to employment.[6] *See, e.g.*, Tr. 1756-57, 2098. Indeed, the Court has thoroughly reviewed Dr. Dillman's chart from the relevant time period and they reflect very little in the way of mental impairment. That is, their counseling sessions focused on plaintiff's parents (her father's employment and substance issues, and both of their health), the COVID-19 pandemic, her frustration with Republican politics and the current state of the world, occasional positive events (decorating for Halloween and carving pumpkins, visiting with her brother or going to the movies with her friend, planning an upcoming trip to Disneyland, etc.), and her CFS and pain symptoms. Tr. 421-30, 945-46, 2110-19. As a result, in early December 2019 (i.e., approximately one month after the alleged onset date), Mr. Dillman "cancel[led] her [diagnosis] of depression as it seems it is more situational." Tr. 428.

Chart notes from plaintiff's other providers reflect PHQ-9 and GAD-7 scores in the mild range (i.e., anywhere from 2 to 8 for the former, and 2 to 6 for the latter).[7] *See, e.g.*, Tr. 610, 634,

---

[6] The Court also notes that plaintiff was on a number of medications, including Dilaudid, that had the ability to negatively impact her energy levels and overall mentation. *See, e.g.*, Tr. 404-05, 476-77; *see also* Tr. 847 (Mr. Dillman acknowledging in his June 2021 opinion that plaintiff experiences "substantive dependence – prescription pain pills").

[7] The PHQ-9 "refers to a specific patient health questionnaire that . . . is an instrument for making criteria-based diagnoses of depressive and other mental disorders commonly encountered in primary care." *Salina S. v. Kijakazi*, 2022 WL 3700880, *5 n.3 (D. Idaho Aug. 25, 2022) (citation and internal quotations and brackets omitted). "PHQ-9 scores are generally interpreted as follows: minimal depression (0-4); mild depression (5-9); moderate depression (10-14); moderately severe depression (15-19); severe depression (20-27)." *Id.* at n.4 (citation omitted). The GAD-7 is a "questionnaire for screening and measuring generalized anxiety disorder." *Tokin v. Berryhill*, 2018 WL 6991114, *4 n.1 (W.D. Wash. Sept. 28, 2018). "Scores of 5, 10, and 15 are taken as the cut-

Page 9 – OPINION AND ORDER

657, 673, 785, 1138, 1168, 1200. Further, plaintiff was able to keep track of her medications and appointments. And there are multiple references in Mr. Dillman's chart notes to plaintiff reading the news and tracking and staying apprised of current events. *See* Tr. 2117 (Mr. Dillman characterizing plaintiff in February 2022 as "smart and informed but her body has betrayed her and her chronic fatigue and pain makes her unable to work"). The ALJ's decision is upheld as to this issue.

## CONCLUSION

For the reasons stated above, the Commissioner's decision is AFFIRMED, and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 6th day of July, 2026.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge

---

off points for mild, moderate and severe anxiety, respectively. When used as a screening tool, further evaluation is recommended when the score is 10 or greater." *Jeremy S. v. O'Malley*, 2024 WL 343179, *10 (S.D. Cal. Jan. 29, 2024) (citation omitted).